# MINNEAPOLIS, ST. PAUL, & SAULT STE. MARIE RAILWAY COMPANY, Appellant, v. WASHBURN LIGNITE COAL COMPANY, Respondent.

(— A.L.R. —, 168 N. W. 684.)

Lignite coal — maximum rates for transporting — legislature — act of — fixing such rates — violation of act — by carriers — action to enjoin — by state — injunction dissolved — difference between statutory rate and alleged reasonable rate — action against shipper to recover — contract — implied — either in fact or in law.

In an act of the legislature passed in 1907 maximum rates were prescribed for the carriage of lignite coal. The carriers declined to comply with the act, and the state brought an action to enjoin continued violation. In March, 1910, the United States Supreme Court affirmed the decree of the state supreme court in favor of the plaintiff, but provided in the decree that the affirmance should be without prejudice "to the right of the railroad company to reopen the case by appropriate proceedings if, after adequate trial, it thinks it can prove more clearly than at present the confiscatory character of the rate for coal." After a period of experimentation the case was reopened and the injunction was continued by the state supreme court, but later, in June, 1915, dissolved by the United States Supreme Court. In an action against the shipper to recover the difference between the statutory rate and an alleged reasonable rate for shipments made during the period between the dates of the first and second decrees of the United States Supreme Court, it is held:

1. The action must be considered as brought upon a contract implied either in fact or law.

Complaint — circumstances from which contract may be implied in fact — absence of such allegations — promise — absence of allegation of — no cause of action on implied contract in fact.

2. In the absence of allegations in the complaint of circumstances from which a contract may be implied in fact, and in the absence of allegations of a

---

NOTE.—On elements entering into determination of reasonableness of railroad rates prescribed by the state for local traffic, see notes in 33 L.R.A. 183, 15 L.R.A. (N.S.) 108, and 25 L.R.A.(N.S.) 1001, in which there is indicated in a general way, the principles and rules that have been applied in the cases cited to the determination of the question as to the reasonableness or unreasonableness of the rates complained of as confiscatory. On effect that return as a whole is reasonable on right to require railroad to transport commodity for less than reasonable compensation, see note in L.R.A.1917F, 1158.

promise, the complaint does not state a cause of action upon a contract implied in fact.

**Statute prescribing rates — invalid under Federal Constitution — confiscatory character — because of — reparation by shipper — not obliged to make — as a matter of law.**

3. When a statute prescribing rates is held invalid under the Federal Constitution because of its confiscatory character, it does not follow that a shipper is obliged, as a matter of law, to make reparation to the carrier.

**Statutes — depriving person of life, liberty, or property — due process of law — without — state cannot make or enforce — Constitution — provisions of — prohibition applicable to state — individual rights transgressed — reparation for — is not secured by Constitution.**

4. Article 14 of the Amendments to the Federal Constitution, which provides that no state shall make or enforce any law which "shall deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction equal protection of the laws," is a prohibition applicable to the acts of the state, and does not, of itself, secure to individuals whose rights may be transgressed by the state a remedy by way of reparation.

**Highest tribunal — decree of — enjoining violation of state statute — defendant coerced into compliance — no conditions imposed — prerequisite to obtaining benefit — decree is damnum absque injuria.**

5. Where a decree of the highest judicial tribunal enjoins the violation of a statute, and the defendant is thus coerced into complying with its provisions, and where no conditions are imposed upon those in whose favor the decree operates as a prerequisite to obtaining the benefits of such decree, any damage done the defendant by the operation of the decree is *damnum absque injuria.*

Opinion filed June 12, 1918.

Appeal from District Court, Burleigh County, *W. L. Nuessle,* J. Affirmed.

*John L. Erdall* (*A. H. Bright, John E. Greene,* and *Dullam & Young,* of counsel), for appellant.

The legislature of North Dakota by enactment fixed maximum interstate rates for the transportation of coal. Laws 1907, chap. 51.

This act was sustained by the decree of the supreme court of North Dakota. 19 N. D. 45; 26 N. D. 438.

The decree of the supreme court of North Dakota was reversed by the decree of the Supreme Court of the United States. 236 U. S. 585.

The case was brought and prosecuted by the attorney general of the

state of North Dakota in his official capacity for and on behalf of all the people of the state. Under such circumstances all the people of the state are bound by the decision and judgment. State v. Villis, 19 N. D. 209, 124 N. W. 706; Ashton v. Rochester, 123 N. Y. 187; McConkie v. Remley, 119 Iowa, 512, 93 N. W. 505; Fullton v. Pomeroy, 111 Wis. 663, 87 N. W. 831; People v. Harrison, 253 Ill. 625, 97 N. E. 1092; McIntieer v. Williamson, 65 Pac. 244; State v. Hartford St. R. Co. 56 Atl. 506; Bank of Kentucky v. Stone, 88 Fed. 383; Bear v. Brunswick County, 29 S. E. 719; Stone v. Winn, 176 S. W. 933; State v. Center Creek Min. Co. 171 S. W. 356; Kansas City Exposition Driving Park v. Kansas City, 74 S. W. 979; Orcutt v. McGilney, 147 N. W. 586; Worrell v. Landis, 141 Pac. 962; Hovek v. Shepherd, 147 S. W. 224; Central Bank & Trust Co. v. State, 76 S. E. 587; State ex rel. Forgues v. Superior Ct. 127 Pac. 313; Greenburg v. Chicago, 99 N. E. 1039; State v. C. B. & Q. R. Co. 93 N. E. 422; People v. Detroit G. H. & M. R. Co. 121 N. W. 533; Pierce v. Pierce, 122 S. W. 1147; Leet v. Gratz, 117 S. W. 642; Davis v. Davis, 124 N. W. 715; Spokane Valley Land & Water Co. v. Jones & Co. 101 Pac. 515; Freeman, Judgm. 4th ed. § 178; Black, Judgm. § 584; 23 Cyc. 1269.

This present action is instituted to recover the difference between the maximum rate fixed by the legislature (being the rate or carrying compensation received by appellant during the course of the litigation), and the reasonable rate for such transportation of coal. The United States Supreme Court's final decree entered in this litigation renders the rate invalid and unconstitutional not only during the period covered by the testimony, but up to and including the time of the decree. Missouri v. Chicago, B. & Q. R. Co. 241 U. S. 533.

The appellant is clearly entitled to recover such difference in rates. N. P. R. Co. v. North Dakota, 236 U. S. 585, 595; Reagan v. Farmers Loan & T. Co. 154 U. S. 362.

The law is well settled that when a judgment or decree is reversed, the law raises an implied obligation or agreement on the part of the person securing the judgment or decree, or the person benefiting thereby, to restore all that was obtained, directly or indirectly, by reason thereof. United States Bank v. Bank of Washington, 6 Pet. 817; 2 Salk. 587, 588; Tidd, Pr. 936, 1137, 1138; N. W. Fuel Co. v. Brock,

139 U. S. 216; Brown v. Detroit Trust Co. 193 Fed. 622; Zimmerman v. Bank, 56 Iowa, 133; Thompson v. Reasoner, 122 Ind. 454; Flemmings v. Riddich, 5 Gratt. 272; Hier v. Brewing Co. 60 Neb. 320; Bellamy v. St. L. I. M. & S. R. Co. 220 Fed. 876.

The appellant here is not seeking to recover damages flowing from or connected with the injunction, but to recover undercharges to which we are entitled by law, independent of the injunction, and which we were temporarily restrained from recovering, by the injunction. Haebler v. Myers, 132 N. Y. 363; Pulteney v. Warren, 6 Ves. Jr. 73; Southern Ry. Co. v. Railroad Commission, 196 Fed. 558; Tift v. Ry. Co. 123 Fed. 789, s. c. 138 Fed. 753; Love v. N. A. Co. 229 Fed. 103, 106.

"The rates fixed by the legislative assembly or Board of Railroad Commissioners shall remain in force pending the decision of the courts."    N. D. Const. § 142.

This provision was doubtless intended simply to prevent a common carrier from applying a different rate from that fixed, pending the litigation. It was probably not intended to prevent an adjustment between the carrier and the shipper, after the litigation was ended, in accordance with the final judgment in such litigation.

A construction such as suggested would make the provision accord with the law as it is generally understood and administered, and would obviate any conflict with the Federal Constitution. Any other construction permits of taking property without due process of law. 236 U. S. 585; Fed. Const. § 1, 14th Amend.; Reagan v. Farmers' Loan & T. Co. 154 U. S. 362.

The construction and the results for which defendant contends would be in conflict with other provisions of the Constitution.

"This Constitution and the laws of the United States, which shall be made in pursuance thereof, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any other state to the contrary, notwithstanding." U. S. Const. art. 6; Smyth v. Ames, 169 U. S. 466; Scott v. McNeal, 154 U. S. 34; Virginia v. Rives, 100 U. S. 313, 318, 319; Ex parte Virginia, 100 U. S. 339; Neal v. Delaware, 103 U. S. 370; United States v. Cruikshank, 92 U. S. 542; Bank of Columbia v. Okely, 4 Wheat. 235, 244; Huntington v. Attrill, 146 U. S. 657;

Mobile & O. R. Co. v. Tennessee, 153 U. S. 486; Loughlin v. McCauley, 186 Pa. 517, 48 L.R.A. 1; Hauenstein v. Lynham, 100 U. S. 483.

*Miller, Zuger, & Tillotson,* for respondent.

There can be no coercion where, by a decree of the court, one is compelled to comply with a valid law. By the first decision of the Supreme Court of the United States, the law in question and the rates fixed thereunder were upheld. One cannot say that he involuntarily and against his will complied with a valid law.

The rates existing during the time of the litigation, down to the date of the institution of the second action, were the legal and lawful rates, and the rates or charges accepted and published by plaintiff as its schedule of rates for such transportation and plaintiff voluntarily accepted such rates as its full compensation for such services.

It is therefore clear that plaintiff's reason for performing the services alleged for the compensation received was not because it was coerced into doing so, by the first decree of the United States Supreme Court, nor was it because of lack of adequate remedy to protect itself; and if not coerced and not lacking of a remedy to protect itself, it must of necessity have been its voluntary act. But even if plaintiff was coerced, and suffered damage as alleged, still a recovery at law is not warranted, because, if any damages followed by reason of such course, they would be damages arising from the act of the court, and damages of such a nature are *damnum absque injuria,* for which there is no redress. Russell v. Farley (U. S. ) 26 L. ed. 1060.

There were no conditions imposed at the time the injunction was obtained, nor did the Supreme Court make any provision as to future recovery. Missouri v. C. B. & Q. R. Co. 241 U. S. 533, 60 L. ed. 1148.

Plaintiff cannot recover under this form of action.

It might have recovered in an action on the bond had one been properly brought. Russell v. Farley, supra; 2 Sutherland, Damages, 2d ed. §§ 520, 521; Hayden v. Keith (Minn.) 20 N. W. 195.

BIRDZELL, J. This is an action to recover the difference between the statutory rate upon certain coal shipments and an alleged reasonable rate. It arose upon the following facts:

In the year 1907, the legislature of North Dakota passed a statute

prescribing a schedule of maximum rates to be charged for hauling lignite coal.  When the law went into effect the carriers declined to comply with it, whereupon an action was brought to enjoin the continued violation.  In this action, the carriers were unsuccessful. State ex rel. McCue v. Northern P. R. Co. 19 N. D. 45, 25 L.R.A. (N.S.) 1001, 120 N. W. 869, and Northern P. R. Co. v. North Dakota, 216 U. S. 579, 54 L. ed. 624, 30 Sup. Ct. Rep. 423.  A supersedeas having been obtained, the statutory rate was not put into operation until after the decree of the United States Supreme Court, in March, 1910.  The case was later reopened in accordance with the terms of the decree and additional evidence taken.  It was then determined by this court that the statutory rates were reasonable, but it was ultimately held by the United States Supreme Court that the rates were confiscatory.  State ex. rel. McCue v. Northern P. R. Co. 26 N. D. 438, 145 N. W. 135; Northern P. R. Co. v. North Dakota, 236 U. S. 585, 59 L. ed. 735, L.R.A.1917F, 1148, P.U.R.1915C, 277, 35 Sup. Ct. Rep. 429, Ann. Cas. 1916A, 1.  The portion of the complaint which states the alleged cause of action is as follows:  "That the plaintiff at the time said shipments moved, and until the 11th day of June, 1915, by reason of the mandate of the Supreme Court of the United States and the decree entered in the supreme court of the state in the year 1910, aforesaid, without its consent and against its will, was coerced and forced to accept and transport for the defendant all of said shipments upon payment to the plaintiff of the rates and charges prescribed in said chapter 51.  That from and after the 11th day of June, 1915, when final judgment was entered in the supreme court of the state in said state case as aforesaid, plaintiff became entitled to recover from the defendant the difference between said lawful and reasonable rates and the rates prescribed by said chapter 51 heretofore paid by the defendant, amounting in all to the sum of $26,819.99."

It will be noted that the complaint alleges that, by reason of the decree of the United States Supreme Court, the plaintiff was coerced and forced to accept and transport shipments for the defendant at rates prescribed by chapter 51 of the Session Laws of North Dakota for the year 1907.  The remainder of the paragraph merely states a legal conclusion to the effect that, by reason of said shipments, the plaintiff became entitled to recover from the defendant the difference between

a reasonable rate and the rate prescribed by the statute, which right is alleged to have arisen on June 11, 1915. It will be observed that it is not alleged that the defendant performed the services under protest or under any sort of legal compulsion, except such as was imposed by the mandate of the Supreme Court of the United States. The decree referred to affirmed that of this court, granting an injunction to prevent the violation of the statute, and the opinion of the court concludes as follows (Northern P. R. Co. v. North Dakota, 216 U. S. 579–581, 54 L. ed. 624, 625, 30 Sup. Ct. Rep. 423): "We do not say that experiment may not establish a case in the future that would require a decision upon the question of constitutional law, but we can express no opinion upon it now. The great difficulty in the attempt to measure the reasonableness of charges by reference to the cost of transporting the particular class of freight concerned is well known and often has been remarked. It seems to us that the nearest approach to justice that can be made at this time is to follow the precedent of Willcox v. Consolidated Gas Co. 212 U. S. 19, 53 L. ed. 382, 48 L.R.A. (N.S.) 1134, 29 Sup. Ct. Rep. 192, 15 Ann. Cas. 1034, as nearly as may be, and affirm the decree, but without prejudice to the right of the railroad company to reopen the case by appropriate proceedings, if, after adequate trial, it thinks it can prove more clearly than at present the confiscatory character of the rates for coal." Following the entry of the above decree, the statutory rate was put into effect in conformity with the judgment.

The pertinent inquiry is: what is the basis for the legal conclusion that, by reason of the shipments, the plaintiff became entitled to recover from the defendant? It is elementary that a pleading which states legal conclusions merely does not state a cause of action; it must state facts from which the legal conclusion of liability follows. It is equally elementary that the facts stated must bring the plaintiff within the operation of some rule of substantive law, according to which a liability may be found to exist. Obviously, the relations between a carrier and a shipper are governed by the same basic principles that would control were they between individuals and related to matters not commonly subject to the regulatory power of the state. A departure from these principles in the case of carriers is only to be countenanced when their application threatens to embarrass, or does actually

interfere with, the exercise of the regulatory power of the government in the interest of justice and equality. Thus, the liberty to contract for the services of a carrier is generally interfered with to the extent necessary to prevent discrimination as between patrons. But we are aware of no rule or policy that requires a determination of this case upon any principle peculiar to the relations of public carriers. It being clear that the liability contended for is not a tort liability, before a recovery can be had it must be found that the defendant is indebted to the plaintiff under an obligation in the nature of contract. This brings us to a consideration of the circumstances alleged in the complaint, and those reasonably inferable from the facts there alleged, for the purpose of determining, first, whether there was any contract, express or implied in fact, for the payment of the difference sought to be recovered; and second, whether, in case no contract in fact is alleged, the complaint states facts from which it must be held that there was a legal obligation in the nature of a contract obligation which could be enforced in this action.

If it be assumed that the shipper acted at all times with full knowledge of the litigation and of its ultimate result, could it then be further assumed that he agreed in fact to pay for the services at a higher rate than that fixed by statute if, perchance, the decree should be modified or reversed at some subsequent time? We think not. A business man acting with full knowledge of the facts that the law in question had been attacked, and that those interested in stopping its action had been defeated after prolonged litigation carried to the highest court in the land, would, we believe, be more apt to assume that he was justified in dealing with the carrier on the hypothesis of the validity of the law, and in the absence of express protest, that the services of the carrier were rendered voluntarily. By "voluntarily" in this connection is meant in voluntary obedience to a supposed law. Sections 4339–4342 of the Revised Codes of 1905 (Comp. Laws 1913, §§ 4724–4727) require, among other things, that the carriers shall print and keep for public inspection schedules showing the rates which are in force at the given time, and they are required to file such schedules with the Railroad Commission. Manifestly, if shippers cannot rely upon the rates as so published and filed, the requirement of publication becomes a mere trap for the unwary. In our judgment, it is wholly improper,

in the absence of clear allegations of the rendition of services under a distinct protest, for a court to find that a shipper had, in effect, undertaken conditionally to pay according to a rate different from that published in compliance with the statute. The foregoing considerations lead inevitably to the conclusion that there was no contract in fact, either express or implied, to pay any rate other than the statutory rate, and that which, from the entry of the decree forward, must be presumed to have been filed and published in accordance with the provisions of § 4727, Comp. Laws 1913, Revised Codes of 1905, § 4342. This should dispose of the complaint, in so far as it may be thought to state a cause of action upon a contract either express or implied in fact.

But it is urged that the obligation to pay a reasonable rate arose as a matter of law, regardless of any express contract or any contract which might have been implied in fact. But this contention is without merit, for the reason that the elements essential to the implication of a contract in law are likewise lacking. Where there is no contract in fact, either implied or express, the law will not imply one except to support a recovery in favor of a plaintiff on the principle that the defendant has been unjustly enriched at his expense. While authorities in point are singularly lacking, the controlling principle is clearly the same as in case of mistake, and it is elementary that where the defendant is free from responsibility for plaintiff's mistake, or is responsible in no greater degree than the plaintiff, and where his position is such that the enforcement of restitution would subject him to loss, the defendant is entitled to retain whatever benefit he has derived from the mistake. Woodward, Quasi Contr. § 20. In such cases it may be unfortunate that the law does not attempt to distribute the loss; but, until some other basis for recovery than that of *unjust* enrichment is established, the party who has sustained the loss must bear it. To allow the plaintiff to recover in this action is to visit the consequences of the wrong imposed, without the fault of either, upon one who would be incapable of obtaining reparation from those who are probably the real beneficiaries of the wrong (the consumer of the commodity).

It frequently happens that the risk of certain contingencies affecting a transaction must, as a matter of law, be held to be borne by one party rather than the other. The law always leaves a loss where it

finds it, unless there is something to indicate that there was an intention to the contrary, or unless it distinctly fixes the burden otherwise. The situation of the plaintiff in the case at bar is very much the same as that described by Justice Learned in the case of Windbiel v. Carroll, 16 Hun, 101, wherein he stated (page 103) : "Ignorance of the fact is one thing; ignorance of the means of proving the fact is another. When money voluntarily paid is recovered back [and this would be no less true as to services rendered], it is because there was a mistake as to some fact. But here the plaintiff was not mistaken as to the fact. Only at the time he did not know how to prove it. The subsequent discovery of evidence to prove the fact, known to the party when he makes the payment, cannot authorize a recovery back of the money. Such a principle would be most dangerous."

In the case at bar, the plaintiff, from the beginning of the proceedings involving the rate, professed knowledge of the facts upon which its invalidity was ultimately determined. But apparently it was not able to choose the appropriate means of proving these facts. It cannot be said to have supplied its services under a mistake as to the facts, and we can see no just reason for allowing it to shift the burden of the experiment to the shipper.

As a further test of the plaintiff's position, it is proper to inquire what the situation would be had the suit to determine the constitutionality of the rate statute been begun by the carrier as one to enjoin the execution of the law. Had relief been denied in such a proceeding, and later, after a reasonable period of experimentation, had the injunction been issued by the United States Supreme Court, preventing the state officers from enforcing the law, manifestly the "coercion," compelling the carrier to apply the statutory rate during the period of experimentation, would not have been of a judicial, but rather of a legislative, character. Its position would have been precisely that of any individual who yields obedience to an unconstitutional law and sustains a loss in so doing. It could not shift this loss to another who was justified in contracting with it, upon the supposition that its yielding was voluntary.

If obligation rests upon the defendant as a matter of law it is wholly because of the fact that the state of North Dakota, through its legislature, has denied to the plaintiff rights secured to it by the 14th

Amendment to the Federal Constitution.  It must be borne in mind that the amendment is intended as a security against any action by the state which may result in the confiscation of property.  It does not secure to the individual or the corporation any particular remedy for the enforcement of the right, but it presupposes that ordinary legal remedies will be adequate.  If, however, supplementary action is deemed necessary in order to give greater security, Congress is given authority to make appropriate provision to that end.  The Civil Rights cases have amply defined the powers of Congress in this connection. Civil Rights Cases, 109 U. S. 3, 27 L. ed. 835, 3 Sup. Ct. Rep. 18.  In legal theory, the remedies provided to prevent the violation of the rights secured are adequate.  They are the usual remedies available in state and Federal courts, and they have never been extended so as to embrace cases of civil liability flowing incidentally from prohibited state action.  The right to so extend them is even denied to Congress. Ibid.  Nothing is clearer than that the amendments (13th, 14th and 15th) do not compromise a code of remedial law, according to which reparation may or must be made for every temporary denial of a right so secured, and that the amendments spend their force in permitting state action to be set aside when it involves a violation of the amendments, and when the right is sought to be vindicated in the ordinary channels.  The remedial law, as between individual suitors, is left entirely untouched and remains subject to such imperfections as are inherent in a judicial system that is compelled to respect practical considerations in measuring individual rights.  Theoretically, there would be no occasion for fastening a liability upon an individual defendant because a state had confiscated the plaintiff's property.  The 14th Amendment contemplates that such action can and should be entirely prevented by a resort to appropriate legal remedies.

In so far as the complaint may be based upon a supposed right to collect a reasonable rate during the period of experimentation, it entirely ignores the effect of the decree of the United States Supreme Court.  While the decree was based upon evidence covering a certain period of time, and in this sense looks backward, it nevertheless operated in the future as well.  In reality, the plaintiff's whole case seems properly hinged upon the real meaning and effect of the first decree of the United States Supreme Court.

The matter that was settled in that suit was the right of the state to an injunction, and it was found that the state was entitled to the relief sought. Neither the state court nor the United States Supreme Court saw fit to impose any terms or conditions. Thus, so far as the party adverse to this defendant is concerned, the decreeing of the mandatory injunction was absolute, and its effect was to compel the plaintiff herein, among others, to apply the statutory·rate until such time as it might obtain relief from the terms of the decree, at the peril of contempt of court. The decree was not interlocutory in any sense, but final; nor do we find that there is anything in the subsequent decree of the same court dissolving the injunction and nullifying the statutory rates which amounts to a qualification of the original decree, except as to the future. Northern P. R. Co. v. North Dakota, 236 U. S. 585, 59 L. ed. 735, L.R.A.1917F, 1148, P.U.R.1915C, 277, 35 Sup. Ct. Rep. 429, Ann. Cas. 1916A, 1.

While the Supreme Court of the United States, in the case of Missouri v. Chicago, B. & Q. R. Co. 241 U. S. 533, 60 L. ed. 1148, 36 Sup. Ct. Rep. 715, explained quite thoroughly the meaning of a decree such as the one involved here, it expressly refrained from deciding whether or·not excess rates paid pending a decision as to the constitutionality of a rate-fixing statute were recoverable in the absence of a condition to that effect, imposed when the injunction was issued. So that, in dealing with this question, we must dispose of it without an authoritative interpretation of the original decree by the court which entered it. But in the light of well-considered precedent, we think the correct interpretation is that the decree was absolute and bound the plaintiff herein for the time being, and also that the damages flowing therefrom were within the rule of *damnum absque injuria.* In the case of Russel v. Farley, 105 U. S. 433, 26 L. ed. 1060, Mr. Justice Bradley stated the principle of nonliability.in such a case as follows: "Where no bond or undertaking has been required, it is clear that the court has no power to award damages sustained by either party in consequence of the litigation, except by making such a decree in reference to the costs of the suit as it may deem equitable and just . . . and if the legal. right is doubtful, either in point of law or of fact, the court is always reluctant to take a course which may result in material injury to either party; for the damage arising from the act of

the court itself is *damnum absque injuria,* for which there is no redress except a decree for the costs of the suit, or, in a proper case, an action for malicious prosecution. To remedy this difficulty the court, in the exercise of its discretion, frequently resorts to the expedient of imposing terms and conditions upon the party at whose instance it proposes to act. The power to impose such conditions is founded upon and arises from the discretion which the court has in such cases, to grant or not to grant the injunction applied for. It is a power inherent in the court as a court of equity, and has been exercised from time immemorial."

Where the enforcement of a statutory rate is enjoined, pending an ultimate determination of its validity, the proceedings from the beginning are predicated upon the right of the shippers to command the services at the rate prescribed, and the injunction is only issued to prevent irreparable loss in case the prescribed rate is ultimately held illegal. It follows from this that, when such a suit is determined adversely to the carrier, the shipper may recover whatever difference there may be between the statutory rate and the rate collected during the progress of the suit. But it is nevertheless appropriate for the court, in enjoining the operation of a statute, to require a bond as an added protection. The right of action upon the bond, however, is not exclusive. Bellamy v. St. Louis, I. M. & S. R. Co. 136 C. C. A. 442, 220 Fed. 876. Where, on the other hand, at the end of an unsuccessful suit, the carrier is restrained from violating the terms of a rate statute, it is manifest that any damages it may sustain through compliance with the injunction are not recoverable. Were the rule otherwise, the injunction, which is merely a continuing expression of the judgment of the court that the statutory rate must be applied, is a judgment deprived of its force as an adjudication of the rights of the parties. The error in the plaintiff's contention inheres in the failure to recognize the injunction as being the continuing expression of the court until such time as it may be modified or dissolved by a new judgment or decree. During such time, it is impossible that there could have been any other measure of the rights and obligations of the parties than that provided in the decree itself.

In so far as the practice of the United States Supreme Court in qualifying decrees in rate cases as being "without prejudice" sheds light

40 N. D.—6.

upon the question in hand, it seems to indicate that the transactions following the entry of such a decree shall be controlled by the prescribed rate where a decree enjoining it has been reversed, or by a rate otherwise lawfully fixed where a decree enjoining the prescribed rate has been affirmed. In the first cases in which such decrees were entered (Knoxville v. Knoxville Water Co. 212 U. S. 1, 53 L. ed. 371, 29 Sup. Ct. Rep. 148; Willcox v. Consolidated Gas Co. 212 U. S. 19, 53 L. ed. 382, 48 L.R.A.(N.S.) 1134, 39 Sup. Ct. Rep. 192, 15 Ann. Cas. 1034) decrees of the lower courts enjoining the prescribed rate were reversed, and the causes remanded with directions to dismiss the bills without prejudice. The entry of such decrees was thought appropriate for the reason that practical experience with the rates in actual operation might result in enabling the companies affected to show, as they had not previously been capable of demonstrating, the confiscatory character of the rates. In Louisville v. Cumberland Teleph. & Teleg. Co. 225 U. S. 430, 56 L. ed. 1151, 32 Sup. Ct. Rep. 741, it was simply stated that the whole question was so much in the air that the court did not feel authorized to let the injunction stand; consequently the decree was reversed "without prejudice." In the case of Des Moines Gas Co v. Des Moines, 238 U. S. 153, 59 L. ed. 1244, P.U.R.1915D, 577, 35 Sup. Ct. Rep. 811, while the court affirmed the decree of the lower court dismissing the bill of the utility company, it modified the order to the extent of providing that the dismissal should be "without prejudice." This modification was made in "view of the fact that ordinarily time alone can satisfactorily demonstrate . . . whether or not the rates established will prove so unremunerative as to be confiscatory in the sense in which that term has been defined in rate-making cases." In all of the foregoing cases, it will be noted that the qualification "without prejudice" was attached to a final order of dismissal. In the Missouri Rate Cases (Knott v. Chicago, B. & Q. R. Co.) 230 U. S. 474, 57 L. ed. 1571, 33 Sup. Ct. Rep. 975, and in the North Dakota Rate Case, Northern P. R. Co. v. North Dakota, 216 U. S. 579, 54 L. ed. 624, 30 Sup. Ct. Rep. 423, the final decrees seem to presuppose the continued pendency of the litigation. In three of the Missouri rate cases, where the injunction against the statutory rate was allowed to stand, the court provided that "the Railroad and Warehouse Commissioners, and the attorney

general of the state, may apply at any time to the court by bill or otherwise, as they may be advised, for a further order or decree whenever it shall appear that, by reason of a change in circumstances, the rates fixed by the state's acts are sufficient to yield to these companies reasonable compensation for the services rendered." A similar decree was entered in the North Dakota case, where the court allowed the statutory rates to continue in effect. Whether the order be one dismissing a bill "without prejudice" or whether it be in the nature of a modification of a final decree permitting subsequent proceedings in the same case, it seems to be interpreted as affecting the rights of parties in the same way. In Missouri v. Chicago, B. & Q. R. Co. 241 U. S. 533, 60 L. ed. 1148, 36 Sup. Ct. Rep. 715, in answering the contention that the reservation "without prejudice" left the whole subject open for renewed attack, the court, speaking through Chief Justice White, stated that the proposition contended for disregarded "the foundation upon which such a reservation came to be applied," and further criticized the contention on the ground that it treated "the reservation without prejudice as looking backward and overthrowing that which was concluded by the decree, instead of considering it in its true light; that is, as looking forward to the future and providing for conditions that might then arise."

The foregoing reference to the qualified decrees and to the reason which seems to have moved the court to enter them seem to indicate clearly that, while the decree was absolutely binding as an adjudication of the rights of the parties down to the time of its entry, it also had the effect of letting the future take care of itself. As to the future, therefore, adopting the construction of the decree most favorable to the plaintiff in this suit, it has simply rendered the service at a rate which both the legislature and the judiciary have determined to be applicable, and it has rendered the service without any other contract on the part of the shipper than would arise from the mere delivery of his goods for transportation according to the prescribed rates. The prescribed rates are either applicable or they are not applicable at the time the goods are delivered for shipment. The legislature and the Supreme Court of the United States have considered that they are applicable; and during the period embraced in this controversy it is inconceivable that either the shipper or the carrier should have been

allowed to question it, except in the manner allowed by the Supreme Court. When that court finally dissolved the injunction, it did not reverse its prior judgment, nor, it seems to us, did it profess to give to the carriers any rights with respect to past shipments that did not exist at the time they were made. These rights were governed by the former decree.

This case is readily distinguishable from that of C. L. Merrick Co. v. Minneapolis, St. P. & S. Ste. M. R. Co. 35 N. D. 331, 160 N. W. 140. In that case, the shipper was allowed to recover the difference between the rate prescribed and collected by the carrier and the statutory rate upon shipments made after the statute went into effect and before the carrier was restrained from violating the statute; whereas, here, the carrier seeks to recover for having done exactly that which it was compelled to do by the decree of the court as a condition to being permitted to secure a dissolution of the injunction. In a case in which a shipper has been permitted to recover the difference between a rate charged and some lower rate, the result has been merely to give to the shipper the benefit of a violated regulatory measure, with which the carrier was not, for the time being, complying. For all purposes of such a situation, the regulatory provision fixes the absolute criterion of reasonableness, and, it having been prescribed by competent authority, a departure therefrom is a distinct breach of the obligation of the carrier. In the case at bar, the effect of the first judgment of the United States Supreme Court was to fix a criterion of reasonableness based upon the statute which should control until the decree might subsequently be modified.

In addition to the reasons assigned, there are strong practical considerations which weigh against the maintenance of an action such as the one at bar. In the case of Van Patten v. Chicago, M. & St. P. R. Co. 81 Fed. 545, which was a suit to recover damages on the ground that the charges exacted by the carrier were unreasonable, it was held that it was competent and proper for the carrier to show in defense that, in obedience to the Interstate Commerce Act, it adopted, printed, and posted a schedule of rates, and that the charges complained of were in accordance with those contained in the schedule. Commissioner Prouty of the Interstate Commerce Commission later criticized this result (Cattle Raisers' Asso. v. Ft. Worth & D. C. R. Co. 7 Inters.

Com. Rep. 553) on the ground that, under the Interstate Commerce Act as it existed at that time, the effect of the decision was to entirely cut off the right to recover any portion of an excessive or extortionate charge. Conceding that the opinion referred to would, under the then existing state of the law, have had the effect pointed out by Commissioner Prouty, it may be open to the criticism of being extreme. But the practical considerations referred to by Judge Shiras afford persuasive reasons for holding the first decree of the United States Supreme Court to have been binding upon the parties until changed, and the damages incident to a compliance therewith to come within the rule of *damnum absque injuria.*

Judge Shiras, in the case referred to (page .551), said: "In the present case, however, the proposition of the plaintiff is that, after the carrier, in obedience to the requirements of the act, has adopted, printed, and posted schedule of rates [which was done in this case under § 4727, Comp. Laws 1913], and for the past five years has received and transported grain, charging the schedule rates therefor, and the shipper, without protest or demur, has delivered his grain for shipment, knowing the schedule rate, and has paid the charges in conformity with the established rate, he may now, and at any time within the period of the Statute of Limitations, bring an action at law for damages, not on the ground that more than the schedule rate was exacted, or that the schedule itself provided for unequal, and therefore unjust, rates, but solely upon the ground that the schedule rates, though uniform and properly proportioned, were greater than they should have been; and thus the question is presented whether the Interstate Commerce Act, considered as a whole, authorizes and provides for an action of this kind. If it can be maintained, it results in the holding that it was the intent of Congress to place upon the courts and juries of the country the duty and burden of establishing the rates of transportation for interstate commerce, and upon the common carrier the burden of transportation, with the right to ultimately retain as pay therefor the rate fixed by the verdict of a jury rendered perhaps five years after the rendition of the services. How is it possible for a jury to pass understandingly upon the question which inheres in the establishment of a properly proportioned and equalized schedule of transportation rates? . . . Now the theory of the plaintiff is that

the jury must inquire into and determine what the reasonable rate was for each shipment when made, and, by comparing the reasonable rate thus fixed by the jury with that actually charged, to determine whether the plaintiff is entitled to damages, and, if so, to ascertain the amount on each shipment made. It is self-apparent that, no matter how intelligent the jury might be, nor how conscientiously and carefully they might endeavor to deal with the problem thus submitted to them, it would be wholly impossible for them to reach a proper verdict under such circumstances.

"But, suppose the case involved but a single shipment, would the difficulty be remedied, if the theory of the plaintiff is to prevail? How could the jury fairly and understandingly deal even with the case of a single shipment, provided the duty is placed upon the jury of determining what a fair and reasonable charge for the particular service would be, unless some standard, already recognized and established, is given them for their guidance? It is impossible for the jury to deal with the questions of the total cost of building, equipping, and operating the line of a railway as a whole, the proportionate cost of the particular transportation in question, the total amount of business done over the entire system, the total burden properly to be laid upon the total business for transportation charges, and the proper proportionate share which the particular shipment should bear."

It is true that these practical considerations should not have weight as against a clear legal right; but since they inhere in, and are so thoroughly characteristic of, the particular matter in controversy, it is only reasonable to suppose that they were present in the mind of the court when the decree in question was entered, and that the court purposely granted the relief unconditioned as to the consequences of a possible future modification. Surely the United States Supreme Court did not intend that, during the entire period its first decree should be in operation, the parties whose business would be affected favorably or unfavorably by the experiment should be left to the uncertainties incident to numerous subsequent jury trials in order to determine the rate applicable to shipments of coal.

The order appealed from is affirmed.

CHRISTIANSON, J. (concurring specially). It was stated upon the argument by counsel for both parties that no objection was made because of any mere technical or amendable defect in the complaint. The defendant asserted and stood squarely upon the proposition that the complaint on its face showed clearly that no cause of action existed or could exist against it under the facts pleaded. And that this, and this alone, was the theory on which the demurrer was interposed and on which it had been argued in the court below, and on which it was asserted in this court.

The questions presented in this case are by no means easy to determine. That the constitutional rights of the plaintiff have been infringed upon and its property taken without due process of law cannot be denied. The rate statute became effective July 1, 1907. State ex rel. McCue v. Northern P. R. Co. 19 N. D. 46, 25 L.R.A.(N.S.) 1001, 120 N. W. 869. It was sustained by the decision of this court, filed April 16th, 1909. Ibid. This judgment was affirmed by the United States Supreme Court in a decision filed March 14, 1910. Northern P. R. Co. v. North Dakota, 216 U. S. 579, 54 L. ed. 624, 30 Sup. Ct. Rep. 423. The case was subsequently reopened and the carrier submitted proof of the receipts and expenses chargeable against the lignite coal traffic for the year commencing July 1, 1910, and ending June 30, 1911. State ex rel. McCue v. Northern P. R. Co. 26 N. D. 438, 145 N. W. 135. Upon the proof thus submitted the United States Supreme Court held the rate confiscatory and violative of the 14th Amendment. Northern P. R. Co. v. North Dakota, 236 U. S. 585, 59 L. ed. 735, L.R.A.1917F, 1148, P.U.R.1915C, 277, 35 Sup. Ct. Rep. 429, Ann. Cas. 1916A, 1.

In a subsequent case, involving the right of a shipper to recover a sum paid in excess of the statutory rate, it was demonstrated, or rather it was conceded, that there was no substantial change in the cost of handling the intrastate lignite coal traffic on the line of the plaintiff railroad at any time between the 1st day of July, 1907, and the 1st day of July, 1911. C. L. Merrick Co. v. Minneapolis, St. P. & S. Ste. M. R. Co. 35 N. D. 331, 338, 160 N. W. 140. Hence, it is established by former adjudications that the rate established by the statute was, in fact, as to the plaintiff confiscatory at all times.

It is undisputed that the plaintiff consistently and vigorously assert-

ed that the statutory rate was confiscatory. It refused to put the rate into effect, and resisted the efforts of the state authorities to do so as long as possible. It put the rate into effect only when it had been commanded by the decree of this court and of the Supreme Court of the United States to do so. Such decree was entered in an action brought on behalf of the state of North Dakota by its attorney general, and such decree necessarily inured to the benefit of the shippers or consumers of lignite coal. A final decree in such action would doubtless be *res judicata* upon the railroad company, on the one hand, and those represented by the attorney general, *i. e.,* the state and its people, on the other hand. The only logical and reasonable deduction that can be drawn from the undisputed facts in this case are that the plaintiff did not put the statutory rate into operation, or voluntarily transport coal at the statutory rate, but did so involuntarily and solely because it could no longer refuse to do so without violating the decree of this court and thereby subjecting itself to penalty. It seems clear to me that under such circumstances it cannot be said that the actions of the carrier in accepting and transporting shipments of coal were voluntary, or the contract of carriage freely and voluntarily made. In order that there may be a valid contract, the parties must consent thereto, and the consent must be free and mutual. The plaintiff had no option. It could not refuse to accept shipments of coal, but "it must, if able to do so, accept and carry" the coal offered to it for transportation, and transport the same over its lines. Rev. Codes 1905, § 5673 (Comp. Laws 1913, § 6236). It was compelled, by the act of the legislature and the judicial decree, to accept and carry intrastate shipments of lignite coal at a confiscatory rate, and it was forbidden under penalty to charge a compensatory rate for performing such service. And if it refused to accept and transport shipments at the confiscatory statutory rate and exacted a compensatory one, the shipper might sue and recover the amount exacted in excess of the statutory rate. C. L. Merrick Co. v. Minneapolis St. P. & S. Ste. M. R. Co. supra. The inevitable result was that, by virtue of the legislative enactment and the judicial decree, the plaintiff's property was taken away and handed over to others, without compensation, in violation of constitutional guaranty. This is indisputably established by, or necessarily inferred from, the facts alleged in the complaint.

That a party may recover excessive payments exacted from him by a common carrier for the transportation of goods, under such circumstances as to indicate that the payment was involuntary, is well settled. And, ordinarily, excessive charges paid under protest to a common carrier having goods in its possession, in order to secure possession of the goods, may be recovered. Such payments are generally recognized as being made under duress, sometimes termed "duress of goods." See cases cited in note to Illinois Glass Co. v. Chicago Teleph. Co. 18 L.R.A.(N.S.) 124. There is another class of cases more nearly peculiar to public service corporations in which the courts allow recovery of excessive payments made, not under duress, but under public necessity resulting from the unequal relation of the parties and the dependence of the individual upon the services in carrying on his business. Ibid.

It would seem to follow as a necessary corollary to the rule stated that where a common carrier is compelled to carry goods at a confiscatory rate under such circumstances as clearly to indicate that the service was performed involuntarily, it ought to be entitled to recover from the person who received the benefit of such involuntary service the difference between the amount received and what would amount to a reasonable compensation for the service performed.

But is the right of the carrier (if any) to recover concluded by the decree putting the rate into effect? At the time the case of C. L. Merrick Co. v. Minneapolis St. P. & S. Ste. M. R. Co. supra, was submitted, the writer was inclined (as were, in fact, all the members of this court) to hold that the first decree, which was qualified as "without prejudice," had been superseded by the final decree. And that the rights of the parties in the C. L. Merrick Co. Case must be measured by the final decree in the rate case. But while the C. L. Merrick Co. Case was pending for decision, the Supreme Court of the United States handed down a decision in Missouri v. Chicago, B. & Q. R. Co. 241 U. S. 533, 60 L. ed. 1148, 36 Sup. Ct. Rep. 715. In that case the court held that a decree in a rate case, although qualified "as 'without prejudice,' not to leave open the controversy as to the period with which the decree dealt and which it concluded, but in order not to prejudice the rights of property in the future, if from future operations and changed conditions arising in such future it resulted that

there was confiscation." And that the reservation "without prejudice" was to be considered "as looking forward to the future and providing for the conditions which might then arise." If this is correct, and if such decree conclusively establishes the validity of the rate during the period prior to its rendition, regardless whether such rate is in fact confiscatory, then the rate so established ought to be deemed valid until the decree is set aside and the rate adjudged to be confiscatory. For, as to the period prior to the rendition of the decree, the parties realize that the validity of the rate is being questioned and its confiscatory character is being asserted by the carrier, while thereafter, and as to the period intervening between the date of the rendition of the decree sustaining the rate and the reopening of the case and the subsequent adjudication of invalidity, the shippers know that the rate has been established not only by legislative enactment, but by judicial decree. This may be illustrated by applying the rule to concrete cases. Thus, in the Merrick Case the carrier refused to accept and transport the coal at the statutory rate for the avowed reason that such rate was confiscatory, and exacted from the shipper a compensatory rate. At the time of the shipment, the shipper knew that the validity of the rate was being questioned, and it was in a position to, and probably did, include the rate paid in fixing the price of the coal. In the instant case, the defendant coal company knew that the statutory rate had been sustained by the decree of this court and of the United States Supreme Court against attack by the carrier on the ground that it was confiscatory; and it probably fixed the price of the coal in view of the prevailing freight rate.

It may also be observed that, although the plaintiff's complaint shows that its property has been taken away and handed over to others without just compensation, it does not show, nor can it reasonably be inferred, that plaintiff's loss was occasioned by any act of the defendant. On the contrary, it appears that such loss was occasioned by the actions of the legislature and of the courts. It would have been possible to have protected the rights of the plaintiff, as well as of the shippers, by proper provision in the first decree, but no such provision was made. And while it is apparent that plaintiff has sustained loss, and that someone has received a benefit corresponding to such loss, it does not necessarily follow that the defendant received such benefit. It is quite

as, and in fact more, likely that the freight rate was reflected in the price of the coal, and that the benefit of the decreased rate was received by the purchasers and consumers of the coal.

The order sustaining the demurrer should be affirmed.

ROBINSON, J. (dissenting). This is an appeal from an order sustaining a general demurrer to the complaint. It avers that at different times between the 30th day of July, 1910, and the 1st day of June, 1915, the plaintiff received and transported coal by the carload for the defendant between points in North Dakota; that the defendant by reason thereof became obligated to pay to the plaintiff the lawful and reasonable rates for such transportation; that the defendant has at all times refused to pay such reasonable rates, and has paid only the rates prescribed by chapter 51 of the Laws of 1907. It avers that the plaintiff refused to comply with chapter 51, and the attorney general brought a suit to compel such compliance. The state supreme court sustained the same. State ex rel. McCue v. Northern P. R. Co. 19 N. D. 45, 25 L.R.A.(N.S.) 1001, 120 N. W. 869. The United States Supreme Court affirmed the decision without prejudice because of defective proof. 216 U. S. 579, 54 L. ed. 624, 30 Sup. Ct. Rep. 423. That by reason of said decisions and by compulsion during part of the year 1910 and until June, 1915, the plaintiff put in force the rates prescribed by chapter 51. That in July, 1911, on due application the state supreme court made an order reopening its judgment and appointing a referee to take additional testimony, and on such testimony it was again adjudged that the plaintiff keep the rates prescribed by chapter 51. State ex rel. McCue v. Northern P. R. Co. 26 N. D. 438, 145 N. W. 135. That on June 11, 1915, the judgment of the state court was reversed and the action dismissed, with costs, $1,878.82. 236 U. S. 585, 59 L. ed. 735, L.R.A.1917F, 1148, P.U.R.1915C, 277, 35 Sup. Ct. Rep. 429, Ann. Cas. 1916A, 1.

The complaint avers that § 142 of the state Constitution is the sole authority for the regulation of rates, and it provides that the rate fixed by the legislative assembly or Board of Railroad Commissioners shall remain in force pending the decision of the courts, and that during the time of said shipments until July, 1915, by reason of the wrongful mandates of the courts, the plaintiff was compelled to accept and trans-

port coal at the rates fixed by chapter 51, which rates were not reasonable. And that at reasonable rates for the services rendered for the defendant, at its request there is due to the plaintiff an additional sum in excess of $26,000.

Disregarding some errors and omissions which counsel agree to waive, the complaint fairly shows that the plaintiff performed services for the defendant at its request in the transportation of coal, and that by compulsion the plaintiff accepted for such services $26,000, less than the reasonable value of the same, and the defendant has refused to pay such reasonable amount. Now it is manifest that if one party may compel another to perform services at less than the reasonable value of the same, he may compel performance without any value at all. If a party may take the services or the property of another without just compensation, he may take it without any compensation, and that is simple robbery. Of course, if the plaintiff voluntarily performed the services for the compensation received—as contended by the defendant—then it cannot recover an additional sum. The defense contends that at the date of the first decree of the United States Supreme Court, the statutory rate was lawful because it was not adjudged unlawful on the testimony submitted, but in that there is a fallacy. If chapter 51 fixed the rate at half the reasonable value or less than the reasonable value, the rate never became lawful by reason of a failure to make proof or the necessity of an experiment to demonstrate the fact. It is quite possible that on a trial the evidence may show that the services were voluntary and made without protest at the compensation fixed by statute, but the averments of the complaint are otherwise.

Here is a fine specimen of specious reasoning. It must be conceded that at the date of the first decision of the United States Supreme Court the statutory rate was lawful. Therefore the decree declaring the same lawful was not erroneous, and therefore said decree only compelled the plaintiff to obey a valid law. Can it be said that a decree of a court compelling the defendant to comply with the valid law is coercive?

The question is, Was the law valid? If it was a valid law at the time of the first decree, it was valid at the time of the second decree and it has always been valid. If a statute was void at the time of the

second decree, it was equally void at the time of the first decree though the evidence failed to show it. The first decree was expressly based on the failure of proof regarding the reasonable value of the services. Hence, on the question of the constitutionality of the law, the United States Supreme Court expressly declined to express an opinion. When the case was reopened and further testimony submitted, the court held that the maximum rates fixed by chapter 51 are unreasonable, requiring the carrier to transport the commodity at a loss, and that "the state exceeded its authority in enacting the statute, which amounts to an attempt to take the property of the carrier without due process of law in violation of the 14th Amendment." Northern P. R. Co. v. North Dakota, 236 U. S. 586, 59 L. ed. 735, L.R.A.1917F, 1148, P.U.R.1915C, 277, 35 Sup. Ct. Rep. 429, Ann. Cas. 1916A, 1.

The complaint shows, by force of this statute and the court decisions, the plaintiff has been compelled to carry loads of coal for defendant at a loss or without just compensation, and that such loss amounts to over $26,000. Hence, the complaint does state a good cause of action.

Order sustaining demurrer should be reversed.